**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re GAS NATURAL, INC. | ) | LEAD CASE NO. 1:13-CV-02805 |
| | ) | |
| | ) | JUDGE LESLEY WELLS |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | **(Doc. No. 38)** |

This is a putative shareholders' derivative action brought on behalf of nominal defendant Gas Natural, Inc. ("Gas Natural" or "the Company"). Before the Court is Defendants'[1] Motion and Memorandum of Law in Support of Their Motion to Dismiss or, in the Alternative, to Stay the Proceedings (hereafter "Motion to Dismiss"). (*See* Motion to Dismiss, Doc. No. 38.) Plaintiffs oppose Defendants' Motion. (*See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss or, in the Alternative, to Stay the Proceedings ("Plaintiffs' Opposition"), Doc. No. 40.) This case is before the undersigned United States Magistrate Judge on referral for general pretrial supervision, including the preparation of reports and recommendations for the disposition of case dispositive motions. (*See* Doc. No. 18.) For the reasons set forth below, the Magistrate Judge recommends that: Plaintiffs' claims against the Individual Defendants for unjust

---

[1]     The Moving Defendants include Ian Abrams ("Abrams"), Wilbur E. Argo ("Argo"), Wade F. Brooksby ("Brooksby"), Nicholas U. Fedeli ("Fedeli"), John R. Male ("Male"), James R. Smail ("Smail"), James E. Sprague ("Sprague"), Michael T. Victor ("Victor"), Kevin Degenstein ("Degenstein"), Gregory Osborne ("G. Osborne"), Richard Osborne ("R. Osborne"), Thomas Smith ("Smith"), and Gas Natural. The individual officer and director defendants will hereafter be referred to as the "Individual Defendants," and together with Gas Natural, "Defendants."

enrichment (Count IV) should be dismissed; Plaintiffs' remaining causes of action should not be dismissed; and Defendants' request for a stay of the proceedings should be denied.

## I. BACKGROUND

### A.    Procedural History

This derivative action was initiated with five similar, but not identical, complaints. On February 26, 2014, the Court consolidated the actions for all purposes, including pre-trial proceedings, pursuant to Federal Rule of Civil Procedure 42(a).  (*See* Doc. No. 32.)  On March 24, 2014, Plaintiffs filed a Consolidated Amended Complaint ("the Complaint" or "CAC") alleging claims arising under Section 14(a) ("Section 14(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), asserting misstatements and omissions in proxy statements issued by Gas Natural in 2009 and 2012, as well as Ohio law based fiduciary duty claims.  (*See* CAC, Doc. No. 36.)  On April 3, 2014, the Court granted Defendants' motion to enforce a discovery stay under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, pending resolution of Defendants' anticipated motion to dismiss.  (*See* Doc. No. 37.)

On May 8, 2014, Defendants filed their joint Motion to Dismiss, seeking dismissal of Plaintiffs' Complaint, or in the alternative, a stay of these proceedings.  (*See* Motion to Dismiss, Doc. No. 36.)  Plaintiffs filed an opposition to Defendants' motion on June 23, 2014.  (*See* Plaintiffs' Opposition, Doc. No. 40.)  On July 25, 2014, individual defendants Abrams, Argo, Brooksby, Degenstein, Fedeli, Greaves, Male, G. Osborne, Smail, Smith, Sprague, and Victor and nominal defendant Gas Natural filed a Reply in

2

Support of their Motion to Dismiss.  (*See* Defendants' Reply Memorandum in Support of Their Motion to Dismiss or, in the Alternative, to Stay the Proceedings ("Defendants' Reply"), Doc. No. 50.)  Plaintiffs filed a sur-reply to Defendants' Reply on August 1, 2014.  (*See* Plaintiffs' Sur-reply in Further Opposition to Defendants' Motion to Dismiss or, in the Alternative, to Stay the Proceedings ("Plaintiffs' Sur-reply"), Doc. No. 57.) Defendant R. Osborne, after obtaining new counsel, filed a separate Reply in Support of Defendants' Motion to Dismiss on August 28, 2014.  (*See* Reply in Support of Motion to Dismiss, or in the Alternative, Motion to Stay the Proceedings ("R. Osborne's Reply"), Doc. No. 62.)

**B.  Relevant Facts**

**1.  The Parties**

Plaintiffs John Durgerian and Joseph Ferrigno allege that they are current shareholders of Gas Natural and have been shareholders since before the time of the alleged wrongdoing described in the Complaint.  (CAC, Doc No. 36 at ¶¶ 17-18.)

Nominal defendant Gas Natural,[2] a publicly-traded Ohio corporation, is a holding company for a series of public utilities that provide natural gas to customers in Ohio, Maine, Montana, Wyoming, North Carolina, Pennsylvania, and Kentucky.  (*Id.* at ¶¶ 19, 51.)  Among these public utilities are Ohio-located subsidiaries Orwell Natural Gas Co. ("Orwell"), Northeast Ohio Natural Gas Corp. ("Northeast"), and Brainard Gas Corp. ("Brainard") (hereafter collectively referred to as the "Ohio Utilities"), all of which are central to the allegations contained in Plaintiffs' Complaint.  (*Id.*)  The wrongdoing

---

[2]   Gas Natural was renamed from Energy West, Inc. ("Energy West") in 2010.  (CAC, Doc. No. 36 at ¶ 19.)

3

alleged in the Complaint also involves transactions between Gas Natural and John D. Oil and Gas Marketing ("JDOG"), which was acquired by Gas Natural in 2013.  (*Id.* at ¶ 5.)  Prior to its acquisition, Defendant R. Osborne owned approximately 86% of JDOG.[3] (*Id.*)

At the time the Complaint was filed, Defendant R. Osborne was Gas Natural's Chief Executive Officer (CEO) and Chairman of the Board and owned 405,777, or 3.9%, of the Company's shares.  (CAC, Doc. No. 36 at ¶ 52.)  Defendant R. Osborne stepped down as the Company's CEO and Chairman on May 1, 2014.  (Motion to Dismiss, Doc. No. 38-1 at 3.)  He is no longer a Gas Natural board member. (Defendants' Reply, Doc. No. 50 at 2.)  Defendant Smith was the Company's Vice President and Chief Financial Officer (CFO) until his retirement on May 1, 2014.  (CAC, Doc. No. 36 at ¶ 22.)  He remains a member of the Board.  (*Id.*)  Defendant G. Osborne was the President and Chief Operating Officer (COO) of Gas Natural from November 2013 until May 2014, and served on the Company's board of directors from September 2009 until he became the Company's CEO in May 2014, following R. Osborne's resignation.  (CAC, Doc. No. 36 at ¶ 21.)  Defendant Degenstein was Gas Natural's President and COO from June 2008 to November 2013.  (*Id.* at ¶ 27.)  He has never served on the Company's board.  (*Id.*)

In addition to R. Osborne, G. Osborne, Smith, and Degenstein, Plaintiffs'

---

[3]   R. Osborne's ownership of JDOG was through the Richard M. Osborne Trust (the "Osborne Trust"), for which he is the sole beneficiary.  (CAC, Doc. No. 36 at p.2, n.2.)

4

Complaint names 10 other individual defendants.[4]  Defendants Argo, Brooksby, Male, and Victor are current members of Gas Natural's board of directors (the "Board"), and Defendants Abrams (February 2008 to June 2010), Fedeli (August 2010 to June 2013), Smail (2007 to July 2010), and Sprague (2006 to March 2010) are former Board members.  (CAC, Doc. No. 36 at ¶¶ 23-26, 28-33.)  All of the Individual Defendants except Argo and Abrams served on the Audit Committee of the Board at some point during their respective tenures.  (*See id.* at ¶ 34.)

### 2.  Alleged Scheme of Wrongdoing

The wrongdoing alleged in Plaintiffs' Complaint revolves around "defendant R. Osborne's scheme to use public companies to funnel money into other–some public, some private–companies owned or controlled by him."  (CAC, Doc. No. 36 at ¶ 3.)  Gas Natural is the gas procurement and asset manager of Northeast and Orwell, two of the Ohio Utilities.  (CAC, Doc. No. 36 at ¶ 102.)  Plaintiffs allege that the vast majority of Gas Natural's revenues come from the Ohio Utilities.  (*Id.* at ¶ 4.)  The Ohio Utilities charge customers for natural gas based on a Gas Cost Recovery ("GCR") mechanism, which is intended by regulators to ensure a fair, just, and reasonable price for the gas purchasing public.  (*Id.*)  Northeast and Orwell used in-house employees to purchase gas directly from local producers until 2008, when JDOG took over the gas purchasing function and became the sole entity responsible for gas purchases.  (*Id.* at ¶¶ 102-103.)

---

[4]    Defendants' Motion to Dismiss divides the Individual Defendants into two groups: Defendants Abrams, Argo, Brooksby, Fedeli, Male, Smail, Sprague, and Victor are referred to as the "Outside Director Defendants," and Defendants R. Osborne, G. Osborne, Smith, and Degenstein, are called the "Officer Defendants."  (Motion to Dismiss, Doc. No. 38 at 1.) The Court uses these classifications in its analysis.

Plaintiffs allege that "as soon as JDOG was used for gas purchasing, Northeast and Orwell immediately began paying more for local production, with rates skyrocketing to $0.85 per Mcf *more* than the average cost of interstate gas."  (*Id.* at ¶ 103) (emphasis in original).  According to Plaintiffs, the Individual Defendants allowed Gas Natural to overpay JDOG for natural gas to enrich R. Osborne.  (*Id.*)  Plaintiffs allege that Gas Natural never questioned JDOG's "exorbitant rates," but instead allowed JDOG to charge unjustified and unreasonable fees to the Ohio Utilities, causing the excessive costs to be passed on to consumers.  (*Id.* at ¶ 104.)

### 3.  PUCO Audits

The Public Utilities Commission of Ohio (PUCO) is the Ohio administrative agency with principal regulatory oversight for public utilities in Ohio, including natural gas distributors such as the Ohio Utilities.  Pursuant to regulations promulgated by PUCO, natural gas utilities may recover their gas procurement costs via the establishment of GCR rates, subject to the oversight of PUCO.  *See generally* O.R.C. § 4905.302, O.A.C. § 4901:1-14.

### 2010 Audit

In January 2010, PUCO initiated a Financial Audit (the "2010 Audit") of the GCR pricing mechanisms for certain Gas Natural subsidiaries, Northeast and Orwell (together, "the Companies").  (CAC, Doc. No. 36 at ¶ 107.)  The audit was conducted to determine the propriety of rates charged over certain periods between 2008 and 2010.  (*Id.* at ¶¶ 106-107.)  The 2010 Audit determined that the purchasing and pricing policies of Gas Natural and its subsidiaries did not comply with various Ohio public utilities regulations.  (*Id.* at ¶ 107.)  The 2010 Audit also identified unfair pricing, improper

6

enforcement of contract terms, and improper payments by Orwell and Northeast to JDOG.  (*Id.*)

Following a public hearing where testimony and evidence were taken, PUCO issued an order (the "2011 Order") detailing improper related transactions, agreements, and contracting processed by the Ohio Utilities that failed to protect the interests of the utilities and their customers.  (*Id.* at ¶¶ 114-119.)  The 2011 Order noted that "the majority of purchase gas volumes and costs billed to the companies' sales involved related parties."  (Motion to Dismiss, Exhibit B 2011 PUCO Report, Doc. No. 28-2 at p. 4.)  It further described Orwell, Northeast, and Brainard's contract with JDOG to buy gas, noting that as of July 1, 2008, "Orwell, Northeast, and Brainard entered into a 15-year, three month 'best efforts' gas sales agreement with JDOG."  (*Id.* at p. 9.)

### 2011 Stipulation

Following the 2011 Order, Northeast, Orwell, PUCO, the Office of the Ohio Consumers' Counsel ("OCC"), and the Staff of PUCO ("Staff") (together, the "Signatory Parties") entered into a stipulation (the "2011 Stipulation") to resolve the issues raised in the 2010 Audit.  (*Id.* at ¶ 108; CAC, Exhibit 3, Doc. No. 36 at pp. 1-11.)  As part of the 2011 Stipulation, the Signatory parties agreed that Orwell overcollected nearly $1 million from customers during the audited period, and that an adjustment of $964,410 would be made in the customers' favor over a 24-month period.  (*Id.* at ¶ 9.)  The Signatory Parties further agreed that Northeast had undercollected over $1 million from customers during the audit period, and that Northeast should collect $1,100,635 through the GCR mechanism over a 24-month period.  (*Id.*)

The 2011 Stipulation stated that "Gas Natural Service Company will coordinate

7

with Staff and the OCC in designing and implementing the request for proposal(s) ("RFP") and the selection criteria that identifies in detail all services to be provided by the successful bidder."  (*Id.* at ¶ 112; CAC, Exhibit 3, Doc. No. 36 at p. 7.)  The 2011 Stipulation further specified that "OCC shall have the right to fully participate in the RFP process to the extent it determines necessary in order to assure that Northeast and Orwell GCR customers are protected from the potential harm from onerous contract terms procuring their natural gas requirements and/or managing their capacity and storage assets."  (*Id.*)  The Signatory Parties agreed that marketers who were affiliated with or related to Northeast, Orwell, and Brainard, would have the opportunity to participate in the competitive bidding process on the identical terms and access to information as non-affiliated marketers.  (*Id.*)  The 2011 Stipulation allowed Gas Natural to continue acquiring gas for Orwell and Northeast from JDOG until the RFP process was completed, but the stipulation noted that Orwell and Northeast "agree that such purchases from [JDOG] will be subject to Staff review in future GCR proceedings.  (*Id.* at p. 8.)

### 2012 Audit

On January 23, 2012, PUCO commenced a second audit (the "2012 Audit") of the GCR pricing mechanisms for Northeast for the period of March 1, 2010, through February 29, 2012, and for Orwell from July 1, 2010, through June 30, 2012.  (CAC, Doc. No. 36 at ¶ 127.)  On November 13, 2013, PUCO issued an Opinion and Order (the "2013 Order") stating the commission's rulings regarding the 2012 Audit.  (*Id.*)  The 2013 Order reported that Northeast and Orwell had not fully complied with the 2011 Stipulation and that the rates the Companies charged during the audit period were

8

excessive.  (2013 PUCO Report, Doc. No. 38-3 at pp. 26, 47.)  The 2013 Order noted that the Companies "failed to demonstrate that their purchasing policies and procedures were fair, just, and reasonable or that they resulted in minimum gas prices."  (*Id.* at p. 62.)

PUCO's investigation also identified issues with the internal controls of Orwell and Northeast, causing PUCO to initiate a full management audit to include a review of Gas Natural's related and affiliated regulated companies.  (CAC, Doc. No. 36 at ¶¶ 176-191.)  PUCO considered such matters as the internal controls of the Companies and affiliates, the propriety of the Companies' compensation system, allegations regarding management actions of the Companies, and the propriety of the Companies' GCR filings.  (2013 PUCO Report, Doc. No. 38-3 at pp. 47-57.)  PUCO concluded that there was "a clear need for sweeping action."  (*Id.* at 56.)

### 4.  SEC Filings

Between April 2011 and August 2013, Defendants R. Osborne, G. Osborne, Smith, Argo, Fedeli, Male, Victor, and Brooksby signed Annual Reports and amendments on Forms 10-K and 10-K/A, attesting to the adequacy and effectiveness of Gas Natural's internal controls.  (CAC, Doc. No 36 at ¶ 204, 207.)  Defendants R. Osborne and Smith also attested to the functioning of Gas Natural's disclosure program pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") on multiple forms 10-K, 10-K/A, and Quarterly Reports on Forms 10-Q.  (*Id.* at ¶ 204.)  Plaintiffs maintain that those representations were directly refuted by the PUCO findings described above, and therefore amount to improper statements in SEC filings regarding the Company's internal controls.

### 5. Proxy Statements

Beginning on September 25, 2012, Gas Natural issued a series of proxy statements in advance of its December 13, 2012, annual shareholder meeting, announcing, *inter alia*, that Gas Natural intended to acquire the assets of JDOG and sought shareholder approval for that transaction.  (CAC, Doc. No. 36 at ¶¶ 208-209.) On March 1, 2013, sufficient votes to approve the acquisition of JDOG were secured. (*Id.* at ¶ 218.)  Plaintiffs argue that Defendants R. Osborne, G. Osborne, Smith, Argo, Victor, Brooksby, Male, and Fedeli failed to provide material information to allow the shareholders to make a fully informed decision in voting their shares.  (*Id.* at ¶¶ 210-216, 219-220.)

### 6. Alleged Insider Trades

Plaintiffs allege that Defendants R. Osborne, Smith, and Degenstein used their knowledge of Gas Naturals' material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.  (*Id.* at ¶ 227.)  According to Plaintiffs, the aforementioned defendants began liquidating their stock from 2010 to 2013 while PUCO was investigating the Company and before the revelations in PUCO's 2013 Order were digested by analysts and disseminated to the public.  (*Id.* at ¶¶ 227-228.)

## II.  LAW & ANALYSIS

### A.    Standard of Review

When ruling on a motion to dismiss, a court construes the complaint in a light most favorable to the plaintiff, accepts all well-pleaded factual allegations as true, and determines whether the plaintiff undoubtedly can prove no set of facts in support of

10

those allegations that would entitle him to relief.  *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).  To survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all the material elements of its claims to sustain a recovery under some viable legal theory.  *Id.*  Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.  *Id.*  A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action  is insufficient.  *Id.*  The factual allegations must be enough to raise a right to relief above the speculative level; that is, there must be "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."  *Id.* at 679.

**B.    Application of Standard**

Defendants argue that all claims against all Defendants should be dismissed.  In seeking dismissal of Plaintiffs' Complaint, Defendants raise the following arguments:

1.    Demand is not excused in this case because a majority of Gas Natural's Board of Directors is independent and otherwise does not face substantial likelihood of liability.

2.    Plaintiffs fail to identify an actionable misstatement or omission in any of the proxy statements at issue.

3.    Plaintiffs fail to state any other plausible claim for relief against the Outside Director Defendants.

11

4.      Plaintiffs' claims against the Officer Defendants based on alleged insider trading do not state cognizable claims under Ohio law.

5.      Plaintiffs' remaining claims against Defendant Degenstein are not "plausible" and should be dismissed.

6.      In the alternative, the Court should stay this proceeding to permit the Gas Natural Board to investigate the substantially similar allegations presented in a demand letter served by a shareholder who is not a plaintiff in this action.

The Court will address each of Defendants' arguments in due course.

**1.      Whether Plaintiffs Have Adequately Pled Demand Futility**

Defendants seek dismissal of Plaintiffs' Complaint on the basis of Plaintiffs' failure to make a pre-litigation demand on Gas Natural's Board and Plaintiffs' failure to plead particularized facts showing that demand was excused as futile.  Defendants maintain that the majority of the current Gas Natural Board is independent, and therefore the Board is entitled to the presumptions that accompany the business judgment rule in assessing any demand in this case, and Plaintiffs' Complaint does not allege facts sufficient to overcome that presumption.  Plaintiffs respond that their failure to make a demand is excused, because they have adequately pled particularized facts showing that a demand would have been futile.

Federal Rule of Civil Procedure 23.1 ("Rule 23.1") governs derivative actions in federal court.  To assert a derivative action, a plaintiff must comply with the demand requirement of Rule 23.1, which provides that a plaintiff must make a demand on the board of directors to take action on an issue before bringing a shareholder derivative action or, alternatively, must establish that demand would have been futile.  *See* Fed. R. Civ. P. 23.1. The substantive law of the state of incorporation is applied to determine whether the failure

12

to make a demand is excused.  *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 109, 111 S. Ct. 1711, 114 L.Ed.2d 152 (1991).  Gas Natural is an Ohio corporation, so the Court applies Ohio law to determine whether demand may be excused as futile.[5]

In Ohio, it is presumed that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation.  *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 24 (1st Dist. 1997) (citation omitted).  The Sixth Circuit has observed that under Ohio law, the "directors of a corporation are charged with the responsibility of making decisions on behalf of the corporation and are the proper parties to bring a suit on behalf of the corporation or, in their business judgment, to forego a lawsuit."  *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617-618 (6th Cir. 2008) (quoting *Drage*, 119 Ohio App. 3d at 24).  "The shareholders may make a demand on the directors to bring a suit on behalf of the corporation, but no shareholder has an independent right to bring suit unless the board refuses to do so *and* that refusal is wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors."  *Id.* (citation omitted).

An exception to the general demand rule permits a shareholder to bring suit on behalf of the corporation without making a demand on the board when the shareholder can demonstrate that the demand would have been futile.  *See* Fed. R. Civ. P. 23.1, Ohio Civ. R. 23.1.  "Futility means that the directors' minds are closed to argument and that they

---

[5]    Ohio courts also regularly consult Delaware law for guidance with respect to demand futility.  *In re Keithley Instruments, Inc., Derivative Litig.*, 599 F. Supp. 2d 875, 888 n.10 (N.D. Ohio 2008) (Lioi, J.)  Accordingly, the Court refers to such authorities in its analysis and treats them as highly persuasive.

13

cannot properly exercise their business judgment in determining whether the suit should be filed." *Drage,* 119 Ohio App. 3d at 25. To sufficiently demonstrate demand futility, a plaintiff must plead facts creating a reasonable doubt that a majority of the board of directors is capable of making a disinterested and independent decision about whether to initiate litigation. *In re Keithley Instruments, Inc., Derivative Litig.,* 599 F. Supp. 2d 875, 890, (N.D. Ohio 2008) (Lioi, J.) (applying Delaware law). "It is not enough to show that the directors simply disagree with a shareholder about filing suit," nor is it enough to allege in conclusory terms that "the directors would not want to sue themselves or each other." *Drage,* 119 Ohio App. 3d at 25. Rather, Plaintiffs must show that at least half of the directors are "antagonistic, adversely interested, or involved in the transactions attacked." *In re Ferro Corp.,* 511 F.3d at 618-19 (quoting *Bonacci v. Ohio Hwy. Express, Inc.,* No. 60825, 1992 WL 181682 at *4 (Ohio Ct. App. July 30, 1992)).

Gas Natural's Board consisted of eight individuals when the Complaint was filed. Thus, to establish demand futility, Plaintiffs needed to raise a reasonable doubt as to the independence and disinterestedness of four of the eight directors. Viewing the Complaint in the light most favorable to Plaintiffs, and for the reasons discussed below, the Court finds that Plaintiffs have sufficiently pled, and the Court is satisfied, that demand is properly excused in this case as futile. Plaintiffs have set forth particularized facts establishing that at least four of the eight Gas Natural Board members as of March 24, 2014, the date the Complaint was filed, were not sufficiently disinterested and therefore could not have considered a demand fairly.[6]

---

[6] In addition to alleging that a majority of the Board lacked independence from Defendant R. Osborne, Plaintiffs allege three other reasons why a

a.    **Director Independence**

Plaintiffs allege that demand is excused because "a majority of the board lacks independence from, and is beholden to, Defendant R. Osborne." (CAC, Doc. No. 36 at § X.B.)  Under Ohio law,

> [a] controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will.  A director may also be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

*In re Keithley Instruments,* 599 F. Supp. 2d at 892 (quoting *Telxon Corp. v. Meyerson*, 802 A. 2d 257, 264 (Del. 2002)).  Here, Plaintiffs have pled particularized facts sufficient to create a reasonable doubt that a majority of Gas Natural's Board was disinterested for purposes of demonstrating demand futility.  Plaintiffs' Complaint cites to statements from confidential witnesses who related that Defendant R. Osborne surrounded himself with individuals who would not question his conduct, rewarding those loyal to him and punishing

---

demand would have been futile: (1) Because Defendants cannot carry the burden of proving the entire fairness of the transactions entered into between Defendant R. Osborne and the Company; (2) because the Director Defendants' conduct is not a valid exercise of business judgment; and (3) because Defendants R. Osborne, Smith, Argo, Victor, Brooksby, and Male face a substantial likelihood of liability for their misconduct. (CAC, Doc. No. 36 at §§ X.A,C,D.) As Plaintiffs have alleged particularized facts that, when taken together, are sufficient to create a reasonable doubt as to the disinterestedness of at least four of the Company's directors, the Court does not find it necessary to address Plaintiffs' remaining three arguments in support of their demand futility allegations.

15

those who challenged him.[7]  (*See* CAC, Doc. No. 36 at ¶¶ 55, 57-61, 67, 70-71, 74, 79, 83.)

---

[7]     In his Reply, Defendant R. Osborne, for the first time, takes issue with
Plaintiffs' reliance on confidential witnesses to establish his dominance
over the Board.  (*See* R. Osborne's Reply, Doc. No. 62 at 8-10.)  Citing
supporting case law, R. Osborne argues that "[b]efore the Court considers
such anonymous allegations, it must examine Plaintiffs' descriptions of the
CW's titles, employers, dates of employment and the detail in the
information each reportedly provided." (*Id.* at 8.)  Defendants did not
challenge the reliability of the confidential witness statements in their
Motion to Dismiss or in the first  Reply; the issue has been raised for the
first time in R. Osborne's Reply.  As a result, Plaintiffs did not have an
opportunity to respond to the argument in their Opposition or in the Sur-
Reply to Defendants' Reply.  Thus, it was improper for Defendant R.
Osborne to raise this new issue in his separate reply, s*ee Scottsdale Ins.
Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008) (explaining reply briefs
allow movant to reply to opposition's arguments, not raise new arguments
in support of motion), and his doing so has only complicated and delayed
these proceedings.  The necessity of Defendant R. Osborne obtaining
new counsel more than a month after Defendants filed their Motion to
Dismiss was completely preventable, as the Court urged Defendants to
seriously consider the possibility of a conflict very early on in these
proceedings:

•      At the February 2014 hearing to appoint a leadership structure in
       this case and after being informed by defense counsel that there
       was a potential conflict, the Court specifically cautioned counsel for
       Defendants that it would not look favorably upon future requests for
       extensions of time to allow new counsel to familiarize himself or
       herself with this case should a foreseeable conflict of interest
       require substitution of counsel.  The Court reiterated its concerns in
       its Minute Order following the hearing. (*See* Order, Doc. No. 30.)
•      Defendant R. Osborne was removed as Gas Natural's Chairman
       and CEO in May 2014.  Defendants did not raise the issue of a
       conflict of interest until July 14, 2014 (*see* doc. no. 41), after R.
       Osborne initiated litigation in state court against some of his co-
       defendants from this action in late June 2014.  The request to
       extend the briefing schedule and allow R. Osborne to obtain new
       counsel came nearly a month and a half after Defendants filed their
       Motion to Dismiss and 21 days after Plaintiffs filed their Opposition.
•      After holding a telephone conference on July 14, 2014, to address
       Defendants' concerns regarding a conflict of interest, the Court
       ordered R. Osborne to file a notice with the Court by July 18, 2014,
       indicating whether he intended to obtain new counsel.  (*See* Order,

For example, Confidential Witness #1 ("CW1") stated that "it was well understood that defendant R. Osborne 'filled the Board with his good friends.'" (*Id.* at ¶ 60.)  Confidential Witness #2 ("CW2") noted that it was "generally understood" that an employee who stood up to R. Osborne risked being fired.  (*Id.* at ¶ 82.)  In addition to allegations of Defendant R. Osborne's dominance, Plaintiffs' Complaint pleads particularized facts explaining why Defendants G. Osborne, Smith, and Victor, in particular, would not vote to initiate litigation against R. Osborne.

In their reply in support of their Motion to Dismiss, Defendants note that Defendant R. Osborne is no longer Gas Natural's Chairman or CEO, having been removed from those positions in May 2014 and having not been nominated by his fellow Gas Natural directors for re-election to the Board.  (Defendants' Reply, Doc. No. 50 at 3.)  According to Defendants, "Plaintiffs' contention that R. Osborne 'dominates' and 'controls' [Gas Natural]'s Board is belied by the facts that R. Osborne was removed as [Gas Natural]'s CEO and Chairman of [Gas Natural]'s Board."  (Defendants' Reply, Doc. No. 50 at 5.)  Under Ohio

---

               Doc. No. 44.)   R. Osborne failed to comply with this Court's directive.

-    When the Court reluctantly granted R. Osborne an extension of time to file his separate reply brief, it warned him that it would not consider new issues raised for the first time in the reply.  (*See* Order, Doc. No. 61.)
-    R. Osborne's delay in obtaining new counsel delayed the completion of briefing in this case by 45 days, as that is the length of time between the original due date for Defendants' Reply Brief–July 14, 2014–and the time R. Osborne filed his separate reply on August 28, 2014.

For the foregoing reasons, Defendant R. Osborne's argument regarding Plaintiffs' reliance on confidential witnesses, found at pages 8-10 of R. Osborne's Reply, is hereby stricken for purposes of Defendants' Motion to Dismiss.  Defendants may raise the issue at the close of discovery.

17

law, however, arguments regarding events occurring *after* Plaintiffs' filed their Complaint are irrelevant to the issue of demand futility.  *See Drage*, 119 Ohio App. 3d at 26 (holding that demand futility must be determined by looking at the positions of the parties when the derivative suit is initially filed).  When Plaintiffs filed the Complaint in March 2014, Defendant R. Osborne was CEO and Chairman of Gas Natural.  Accordingly, the Court considers only events occurring prior to the filing of the Complaint in assessing the demand futility issue, and finds that Plaintiffs have alleged sufficient facts showing that Defendants G. Osborne, Smith, and Victor were incapable of acting independently of Defendant R. Osborne prior to March 24, 2014.[8]

### Defendant G. Osborne

Defendant G. Osborne, the son of R. Osborne, was the President and COO of Gas Natural from November 2013 until May 2014, and served on the Board from September 2009 until he became the Company's CEO in May 2014.  (CAC, Doc. No. 36 at ¶ 21.)  Plaintiffs allege that G. Osborne could not properly consider a demand, because he "would not vote to initiate litigation against his own father."  (CAC, Doc. No.

---

[8]     In the Complaint, Plaintiffs do not meaningfully allege that Defendants Argo, Brooksby, Male, and non-defendant Richard K Greaves–members of the Board at the time the Complaint was filed–lacked independence from or were beholden to R. Osborne.  (CAC, Doc. No. 36 at ¶¶ 245-252.)  Notably, Defendants have not argued in their Motion to Dismiss that R. Osborne is capable of disinterestedly and independently considering a demand.  While Defendant R. Osborne argues in his separate Reply Brief that he did not breach his fiduciary duties and, therefore, demand on him would not have been futile, the Court declines to consider this new argument, as it was not raised in Defendants' Motion to Dismiss.  *See supra* note 7.  Accordingly, in order to establish that demand would have been futile in this case, Plaintiffs needed to allege with particularity that Defendants Smith, Victor, and G. Osborne were controlled or dominated by Defendant R. Osborne.

36 at ¶ 246.)  Plaintiffs further allege that Defendant G. Osborne would not vote to initiate litigation against R. Osborne when R. Osborne was responsible for G. Osborne's "lucrative positions at the Company," and, as Chairman of the Board and CEO of Gas Natural, controlled G. Osborne's employment.  (*Id.*)

In support of their argument that G. Osborne is beholden to R. Osborne, Plaintiffs cite case law standing for the proposition that family relationships are critical in assessing director independence.  (Plaintiffs' Opposition, Doc. No. 40 at 9-10, n.7.)  At least one Delaware court has concluded that "[t]he existence of a very close family relationship between directors should, without more, generally go a long (if not the whole) way toward creating a reasonable doubt."  *Mizel v. Connelly*, CIV. A. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999); *see also* *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (holding that "[c]lose familial relationships between directors can create a reasonable doubt as to impartiality.  The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable.")

Notably, Defendants have not challenged Plaintiffs' allegations that G. Osborne, because he is the son of R. Osborne, lacked impartiality to consider a demand.  In light of the strong presumption of interestedness present when a director has a close familial relationship with another director, and Defendants' failure to challenge Plaintiffs' allegations of G. Osborne's lack of independence from his father at the time the Complaint was filed, the Court finds that Plaintiffs have pled sufficient facts to raise a reasonable doubt that G. Osborne was capable of acting independently from R.

19

Osborne.  As discussed previously, events that have occurred between G. Osborne and

R. Osborne subsequent to the filing of the Complaint are irrelevant in determining

demand futility.  *See Drage*, 119 Ohio App. 3d at 26.

### *Defendant Smith*

Defendant Smith was the CFO of Gas Natural, the President of Northeast and

Orwell at the time the Complaint was filed, and, prior to that, the COO and director of

John D. Oil and President of JDOG.  (CAC, Doc. No. 36 at ¶ 247.)  Plaintiffs note that

Defendant Smith was "President of Orwell, Northeast, and JDOG for over a decade, was

a director of OsAir until April 2014–all entities own and controlled by defendant R.

Osborne–and he earned nearly $600,000 from those positions in 2012 and 2013."

(Plaintiffs' Opposition, Doc. No. 40 at 11.)  Plaintiffs further note that Defendant Smith's

wife worked at a Gas Natural subsidiary and his two daughters have worked at Gas

Natural at various times.  (CAC, Doc. No. 36 at ¶ 247.)  Under these facts, Plaintiffs

allege that although Defendant Smith was scheduled to retire from Gas Natural in May

2014 and therefore did not depend on R. Osborne for his future employment, he would

not vote to initiate litigation against Defendant R. Osborne, "to whom he owed his and

his family members' livelihoods at various points in time."  (Plaintiffs' Opposition, Doc.

No. 40 at 11.)

Defendants argue that Defendant Smith is not beholden to R. Osborne, as

nothing alleged about Defendant's former employment with Gas Natural suggests that

he would have sacrificed his reputation in favor of his relationship with R. Osborne.  The

Court disagrees.  As Plaintiffs note, "the determination of whether a particular director is

'beholden' to an allegedly controlling person is not limited to the power to affect the

20

director in the future.  One may feel 'beholden' to someone for past acts as well." *In re Limited, Inc.*, CIV.A. 17148-NC, 2002 WL 537692, *7 (Del. Ch. Mar. 27, 2002).  As Defendant Smith earned significant compensation not only from his executive position at Gas Natural, but from several other entities owned and controlled by Defendant R. Osborne, there is a reasonable doubt that Smith would vote to take action against R. Osborne.

Moreover, as President of Orwell and Northeast and a director of JDOG, Defendant Smith was on notice of PUCO's 2011 and 2013 orders identifying an alleged pattern of behavior favoring affiliates of the Ohio Utilities.  In fact, PUCO's 2011 Order notes that Defendant Smith testified at the hearing regarding the financial/GCR audits and describes all of the positions Smith held in which he reported directly to R. Osborne. (Exhibit B 2011 PUCO Report, Doc. No. 38-2 at 13-14.)[9]  Furthermore, PUCO's 2013 Order specifically addresses Defendant Smith, noting: "It appears from the evidence that

---

[9]      PUCO's 2011 Order states:

> Thomas J. Smith appeared in response to a subpoena requested by OCC.  Mr. Smith testified that he held various leadership positions in companies owned by Richard M. Osborne.  Mr. Osborne is chairman of the board of Orwell, Northeast, and JDOG.  Mr. Osborne appointed Mr. Smith as president of each of the companies.  In addition to positions in other affiliates, Mr. Smith also testified that he held the positions of treasurer and secretary. . . .  He is president of Great Plains, the holding company for Northeast.  He is president of Lightning, the parent company of Orwell.  He also holds the positions of vice president and chief financial officer of Gas Natural and Energy West. . . .  In all positions he reports directly to Mr. Osborne.

(2011 PUCO Order, Doc. No. 38-2 at 14.)

the Companies demonstrated an indifference to their fiduciary duties.  The evidence shows that this indifference started at the top with Mr. Smith. . . ." (Exhibit C 2013 PUCO Report, Doc. No. 38-3 at 44.)   Defendants do not suggest that Defendant Smith took any action on behalf of Gas Natural, Orwell, Northeast, or JDOG, to remedy the alleged wrongdoing first identified in the 2011 Order and again in the 2013 Order. Instead, Defendants maintain that Gas Natural "has operations in multiple locations across the country, and Plaintiffs provide no basis for concluding that [Gas Natural]'s Board would have had knowledge or regular reports on the minutiae of the Ohio Utilities control environments." (Defendants' Reply, Doc. No. 50 at 6.)  Given Defendant Smith's affiliation not only with Gas Natural, but with Orwell, Northeast, and JDOG as well, coupled with direct references in the PUCO orders to Defendant Smith's roles at the aforementioned companies, a reasonable doubt exists as to Defendant Smith's ability to consider a demand as a disinterested director of Gas Natural.

### Defendant Victor

Plaintiffs allege that Defendant Victor, a member of the Company's Board since December 2008, is incapable of acting independently of R. Osborne due to the close business and personal ties between the two.  According to Plaintiffs, the Osborne family made large monetary donations to Lake Erie College while Defendant Victor was serving as president of the college.  (CAC, Doc. No. 36 at ¶ 65.)  Plaintiffs allege that R. Osborne's father made a gift of $1 million dollars to the college in 2008, and Defendant R. Osborne made a personal gift of $1.5 million in 2009.  (*Id.*)  The same year he gave his $1.5-million-dollar donation, R. Osborne received the Lake Erie College Distinguished Citizen of the Western Reserve Award.  (*Id.*)  Furthermore, Osborne

22

served on Lake Erie College's board of directors at the time the Complaint was filed, and Gas Natural has held its annual shareholders meeting at the college since at least 2011. (*Id.* at ¶¶ 65-66.)

Plaintiffs argue that Defendant Victor feels a sense of "owingness" to R. Osborne arising out of the largess of the Osborne family in connection with Defendant Victor's service as President of Lake Erie College.  The Court agrees that the large donations R. Osborne and his father gave to Lake Erie College while Defendant Victor served as president can reasonably be considered as instilling in Victor a sense of "owingness" to R. Osborne. *See In re Ltd.,* 2002 WL 537692 at *7 (potential for sense of "owingness" due to significant monetary donation to Ohio State by a director created reasonable doubt with regard to independence of the president of Ohio State); *see also Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002) (independence lacking where "the entity has direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.").  While the donations from R. Osborne and his family were not gifts made to Victor personally, they reflected positively on him and his fundraising efforts as president of Lake Erie College.  Due to Defendant R. Osborne's affiliation with the college and Defendant Victor, the Court concludes that Plaintiffs have alleged particularized facts creating a reasonable doubt as to Victor's independence from R. Osborne's domination.

Plaintiffs also allege that Defendant Victor had a sense of "owingness" to R.

23

Osborne arising out of the appointment of Victor's son-in-law, Colin Russ, as an officer

of Gas Natural.  (CAC, Doc. No. 36 at ¶ 71, 249.)   The Complaint alleges that a month

after marrying Victor's daughter, Mr. Russ was appointed Chief Information Officer

("CIO") of the Company.  (*Id.* at ¶ 249.)  At the time of his appointment, Mr. Russ was

23-years-old and had only a year of work experience following undergraduate school.

(CAC, Doc. No. 36 at ¶ 71.)  Plaintiffs allege that Defendant Victor feels a sense of

owingness to R. Osborne for placing his son-in-law in an executive position and

continues to be beholden to R. Osborne for keeping Mr. Russ employed.  (*Id.* at ¶ 249.)

Defendants respond that family employment ties can only apply to excuse demand

where a family member is an "executive officer" of the Company as defined by the NYSE

Corporate Governance rules.  (Motion to Dismiss, Doc. No. 38 at 12, citing *In re J.P.*

*Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005)).  As Plaintiffs

note, however, the NYSE standards for independence are not coextensive with the

standards for demand futility.  *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 648

n.26 (Del. 2014) (noting that "directors' compliance with NYSE independence standards

'does not mean that they are necessarily independent under [Delaware] law in particular

circumstances.'").  While R. Osborne's employment of Victor's 23-year-old son-in-law as

CIO of Gas Natural may not be enough, on its own, to raise a reasonable doubt as to

Victor's disinterestedness, together with the Osborne family's connection to Lake Erie

College, Plaintiffs have pled particularized facts establishing that Victor is beholden to R.

Osborne and would not vote to initiate litigation against him.

The Court finds that the particularized facts alleged in Plaintiffs' Complaint, when

taken together, are sufficient to create a reasonable doubt as to the disinterestedness of

at least four of Gas Natural's directors as of March 24, 2014.  At the same time, the

Court cautions that this conclusion involves only the sufficiency of the pleadings with

respect to demand futility and reflects no opinion as to the truth of the allegations or the

outcome of the claims on the merits.

### 2. Whether Plaintiffs Failed to Identify an Actionable Misstatement or Omission in Any of the Proxy Statements at Issue

Plaintiffs' Complaint alleges that Defendants R. Osborne, G. Osborne, Smith,

Argo, Victor, Brooksby, Male, and Fedeli (collectively the "Proxy Defendants") made

improper statements:

> Starting as of at least November 24, 2010, the date the first PUCO report on Orwell and Northeast was issued, the Individual Defendants serving as fiduciaries at that time were made aware of the internal controls failures at the Company.  Yet, rather than publicly acknowledge these failures, they improperly attested to the public that these controls were working.  They failed to disclose to the public the true nature of the Company's internal controls, including the internal controls of its subsidiaries in quarterly and yearly periodic SEC filings, as well as in proxy filings.

(CAC, Doc. No. 36 at ¶ 198.)

Defendants have taken issue with Plaintiffs' allegations regarding proxy

statements relating to Gas Natural's acquisition of JDOG.  According to Plaintiffs, the

Proxy Defendants failed to disclose several key facts, including: (i) that Gas Natural

overpaid for natural gas from JDOG, in violation of the 2011 Stipulation; (ii) how much

JDOG's revenue and income was directly attributable to the improper fees and

premiums that Gas Natural paid to JDOG; and (iii) that Gas Natural rigged the Request

for Proposal ("RFP") process to ensure that JDOG would win the new contracts.  (*See*

CAC, Doc. No. 36 at ¶¶ 211-215.)  Defendants argue that Plaintiffs' Exchange Act

claims must be dismissed, because Plaintiffs have failed to identify an actionable misstatement or omission in any of the proxy statements at issue.  According to Defendants, Plaintiffs' non-disclosure claim rests entirely on whether there was a breach of fiduciary duty relating to Gas Natural's alleged overpayment of gas to JDOG and its alleged rigging of the RFP.  Thus,  Defendants maintain that Plaintiffs' federal securities claim is invalid, because it relies solely on a legal determination of state law.

Section 14(a) of the Exchange Act establishes liability for material misstatements or omissions in a proxy statement.  15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). There are four basic elements of a claim under Section 14(a): (i) the proxy statement contains a material misrepresentation or omission; (ii) the defendants were at least negligent; (iii) the misrepresentations or omissions caused the loss of which the plaintiff complains; and (iv) the proxy statement was an essential link in the completion of the transaction at issue.  *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 868 (S.D. Ohio 2013) (quoting *Lane v. Page,* 727 F.Supp.2d 1214, 1227-1228 (D.N.M. 2010)).  A statement or omission is materially misleading if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," and the statement or omission "renders the proxy materials misleading."  *Id.* at 869.

Here, Plaintiffs have plead actionable statements and omissions in proxy statements related to the JDOG acquisition.  Plaintiffs have alleged that the misstatements identified in the Complaint misrepresent the purpose of the JDOG acquisition, the history of JDOG's dealings with Gas Natural, and the benefits of the JDOG transaction.  (CAC, Doc. No. 36 at ¶¶ 211-215.)  Plaintiffs' Complaint explains, in detail, the statements and omissions that rendered the proxies, starting with the first

proxy on September 25, 2012, and subsequent proxies until February 13, 2012, false and misleading.  (*Id.*)  According to Plaintiffs, the proxy statements "were affirmatively misleading because they presented to the shareholders a sanitized version of the transaction, designed to hide all traces of the improper dealings with JDOG."  (Plaintiffs' Opposition, Doc. No. 40 at 22.)  Plaintiffs' Complaint identifies the specific statements in the proxy statements that support this claim, followed by an explanation of how the statements and omissions were misleading to investors:

- **"'John D. Marketing is a party to various agreements with respect to gas sales and purchases and transportation services with other entities owned or controlled by [R.] Osborne, which will continue after the acquisition.'"** (CAC, Doc. No. 36 at ¶ 211.)  According to Plaintiffs, this statement misled investors into believing that JDOG would continue to conduct business with Gas Natural as it had in the past, when in fact "[t]he manner in which JDOG would conduct business with entities owned or controlled by defendant R. Osborne, including Gas Natural, was significantly impacted by PUCO's actions."  (*Id.*)

- **"The purpose of 'the acquisition [was to] improve [its] competitive position and ability to grow [its] gas marketing operations.'"**  (*Id.* at ¶ 212.)  Plaintiffs allege that this statement was false and misleading to investors because it failed to disclose that PUCO had criticized Gas Natural for failing to compete in dealing with JDOG, but then asserted that the JDOG acquisition would increase Gas Natural's ability to compete.  (*Id.*)

- **"We expect that John D. Marketing's management team will be integrated with our management team as John D. Marketing's operations are combined with our own operations."**  (*Id.* at ¶ 213.)  According to Plaintiffs, this statement falsely misled investors into believing that JDOG's management team was different than that of Gas Natural and its subsidiaries.  (*Id.*)  Plaintiffs allege that "[a] reasonable investor would want to know that the management team of JDOG was being run by or had been run by Gas Natural and its subsidiaries' management team, in determining whether to

approve the acquisition of JDOG." (*Id.*)

- **"'[T]he special committee considered the following material factors that it believed supported its determinations,'** including **'John D. Marketing's historical financial performance and condition, including results of operations,'** and **'John D. Marketing's competitive position.'"** (*Id.* at ¶ 214.) Plaintiffs argue that these statements were false and misleading because "they failed to disclose that JDOG's prior financial performance, and its 'competitive position,' had been largely driven by the Individual Defendants' manipulation of Gas Natural to benefit JDOG." (*Id.*)

- **"John D. Marketing, in effect, will operate its businesses in substantially the same manner as it operated business prior to the signing of the purchase agreement."** (*Id.* at ¶ 215.) Plaintiffs maintain that this statement misled investors to believe that there were no changes at JDOG, when in fact PUCO's investigation had necessitated "massive changes," and essentially "forced" Gas Natural and JDOG to deal on different terms. (*Id.*) (emphasis in original).

As Plaintiffs have noted, "[t]o the extent the materiality question is close, the general rule for securities fraud cases is that at [the motion to dismiss] stage in the proceedings, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* at 869 n.23 (alteration in original) (citing *City of Monroe Emps. Ret. Sys. V. Bridgestone Corp.*, 387 F.3d 468, 499 (6th Cir. 2004)). Here, reasonable minds could conclude that: Gas Natural shareholders voting on the acquisition of JDOG would want to know the precise nature of the relationships among Gas Natural, the Ohio Utilities, and JDOG as revealed by PUCO's 2010 Audit; and the Proxy Defendants acted at least negligently in filing the proxies without including such material

28

information.[10]

Moreover, Plaintiffs have not, as Defendants contend, merely "bootstrapped" their state law breach of fiduciary duty claims into a federal securities law claim by alleging nondisclosure of the purported breaches.  "It is well-settled that the federal securities laws may not be used to redress state law claims of corporate mismanagement and other breaches of fiduciary duty."  *Sogevalor, SA v. Penn Cent. Corp.*, 771 F. Supp. 890, 894 (S.D. Ohio 1991) (citing, *inter alia*, *Santa Fe Industries, Inc. V. Green*, 430 U.S. 462, 479, 92 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977)).  Thus, "allegations that a defendant did not disclose facts material only to a state law fiduciary duty claim does not give rise to a cause of action under the federal securities laws."  *Id.* (citation omitted).  Here, Defendants suggest that Plaintiffs' claims of misleading proxy statements rely solely on the Individual Defendants' failure to disclose their own breaches of fiduciary duty to voting shareholders.  If that were the case, Defendants would be correct in arguing that Plaintiffs' Exchange Act claims must be dismissed.  Plaintiffs have not, however, alleged that the proxy statements were misleading

---

[10]    Defendants maintain that the improprieties Plaintiffs have alleged were not determined by PUCO until the issuance of the 2013 PUCO Order in November 2013, nine months after the publication of the last proxy statement at issue.  (Defendants' Reply, Doc. No. 50 at 10.)  While the Court agrees that it was PUCO's 2013 Order that revealed violations of the 2011 Stipulation, the 2011 Order nonetheless determined that the purchasing and pricing policies of Gas Natural and its subsidiaries did not not comply with various Ohio public utilities regulations.  (CAC, Doc. No. 36 at ¶ 107.)  The 2010 Audit identified unfair pricing, improper enforcement of contract terms, and improper payments by Orwell and Northeast to JDOG.  (*Id.*)  Thus, the 2011 Order sufficiently described the alleged wrongdoing Plaintiffs claim should have been disclosed to shareholders prior to voting on the JDOG acquisition.

because the Individual Defendants omitted from the statements that PUCO had uncovered corporate management at the Companies and related R. Osborne-controlled entities.  Instead, Plaintiffs assert that the Proxy Defendants omitted from the proxy statements material information regarding dealings among Gas Natural, JDOG, and the Ohio Utilities that a reasonable shareholder would consider important in deciding how to vote.  This material information includes: (i) Gas Natural's overpayment for natural gas from JDOG, in violation of the 2011 Stipulation; (ii) the amount of JDOG's revenue and income that was directly attributable to the improper fees and premiums that Gas Natural paid to JDOG; and (iii) the rigging of the RFP process to ensure that JDOG would win the new contracts.  (*See* CAC, Doc. No. 36 at ¶ 210.)  Accordingly, Plaintiffs have not "bootstrapped" their state law breach of fiduciary duty claims into a federal securities law claim, and it was appropriate for Plaintiffs to seek redress for damages resulting from the JDOG acquisition through a federal securities claim arising from allegedly misleading proxy statements.[11]

---

[11]    In his Reply Brief, Defendant R. Osborne argues that Plaintiffs "have not and cannot plead any basis for holding Mr. Osborne responsible for any of the alleged misrepresentations in the Proxy related to the acquisition of JDOG." (R. Osborne's Reply, Doc. No. 62 at 6.)  According to Defendant R. Osborne, Plaintiffs concede in their Opposition that R. Osborne did not approve the JDOG acquisition and drop him as one of the "Proxy Defendants."  (*Id.*)  It is true that Plaintiffs, in their Opposition, do not appear to argue that R. Osborne is liable for the alleged misleading statements and omissions in the proxy statements related to the JDOG acquisition.  Furthermore, Defendant R. Osborne raises serious doubts in his Reply that he could be liable for the alleged misleading proxy statements, noting that he did not participate in deliberations over the JDOG transactions and was not one of the directors who recommended the JDOG proposal to shareholders.  (*Id.*)  Because Defendants did not raise this argument in their Motion to Dismiss, however, the Court will not consider it at this time.

### 3. Whether Plaintiffs Failed to State any Other Plausible Claim for Relief Against the Outside Director Defendants

Defendants argue that the Outside Director Defendants–Defendants Abrams, Argo, Brooksby, Fedeli, Male, and Smail–must be dismissed from this action on the grounds that: (a) they were members of *Gas Natural's* Board, not any of the subsidiaries of Gas Natural that form the basis of Plaintiffs' allegations; (b) they cannot be liable for unjust enrichment claims that are based solely on their receipt of ordinary compensation; and (c) all claims against defendants Abrams, Smail, and Sprague are premised on allegations that post-date their tenure on the Board.

### a. Plaintiffs' Claims for Breach of Fiduciary Duty

Defendants argue that Plaintiffs' claims for breach of fiduciary duty and waste of corporate assets[12] fail because they are premised on generalized allegations of

---

Moreover, in addition to alleging misleading proxy statements relating to the JDOG acquisition, Plaintiffs' Complaint also alleges that Defendant R. Osborne signed Annual Reports and amendments on Forms 10-K and 10-K/A attesting to the adequacy and effectiveness of Gas Naturals' internal controls, "despite clear indications these controls were not in place, followed, or effective."  (CAC, Doc. No. 26 at ¶ 200.) Thus, Plaintiffs allege misstatements not only in proxy filings, but in quarterly and yearly periodic SEC filings as well.  In their Motion to Dismiss, Defendants do not raise any challenge to the sufficiency of Plaintiffs' allegations that certain individual defendants, including Defendant R. Osborne, made improper statements in SEC filings regarding Gas Natural's internal controls. Accordingly, to the extent R. Osborne argues in his Reply that Plaintiffs' claim that he violated Section 14 of the Exchange Act cannot withstand dismissal, his argument fails to address the totality of the Plaintiffs' allegations.

[12]   Under Ohio law, corporate waste is a way in which a corporate director's fiduciary duty can be breached, not a separate cause of action independent of a fiduciary breach. *Keithley Instruments,* 599 F. Supp. 2d at 903.

mismanagement relating to the operations of certain Gas Natural subsidiaries rather than Gas Natural itself.  According to Defendants, "Plaintiffs have alleged broadly, on a 'group pleading' basis, that the 'Director Defendants knew or were reckless in not knowing that: (i) [Gas Natural] repeatedly overcharged for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) the Company rigged the RFP to ensure its affiliates would win the contracts; and (iii) the Company had severely inadequate internal controls to prevent the above wrongs.'" (Motion to Dismiss, Doc. No. 38 at 22, quoting CAC, Doc. No. 36 at ¶ 282.)  Defendants maintain that the allegations in Plaintiffs' Complaint regarding the gas overcharges and RFP were not properly pled as to Gas Natural, because the PUCO audits addressed the conduct of two of the Ohio Utilities–Northeast and Orwell–not Gas Natural. Furthermore, Defendants argue that Plaintiffs have not alleged facts that could possibly establish liability for any alleged inadequate internal controls at the Ohio Utilities, because the Outside Director Defendants did not owe fiduciary duties to the Ohio Utilities.

Under Ohio law, a claim for breach of fiduciary duty against a director must plead that "the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation."  Ohio Rev. Code. § 1701.59(E).  To satisfy the requirements of the Ohio statute, Plaintiffs must plead facts, as distinct from generalized conclusions, which, if proved, would overcome the presumption that the Outside Director Defendants have acted in good faith and in the best interests of the corporation.  In re Goodyear Tire & Rubber Co. Derivative Litig., 503CV2180, 2007 WL

32

43557, *9  (N.D. Ohio Jan. 5, 2007) (citing *Abrahamson v. Waddell*, 63 Ohio Misc. 2d 270, 273, 624 N.E.2d 1118, 1120 (Com. Pl. 1992)).

Defendants maintain that Plaintiffs' claims against the Outside Director Defendants are not plausible on their face, because they rely on a false presumption that "Board membership-equals-misconduct."  (Motion to Dismiss, Doc. No. 38 at 21.) The Court disagrees, as Plaintiffs have pled valid breach of fiduciary duty claims against the Outside Director Defendants that are adequately supported by, *inter alia,* two PUCO reports resulting from financial audits of the Ohio Utilities in 2010 and 2012. (*See* CAC, Doc. No. 26 at ¶¶ 107-128.)  Although PUCO audited Orwell and Northeast, not Gas Natural, Plaintiffs' Complaint sufficiently demonstrates the interrelatedness of JDOG, the Ohio Utilities, Gas Natural, and other public and private companies owned or controlled by Defendant R. Osborne.  Plaintiffs have alleged an elaborate scheme whereby Gas Natural overpaid related entities owned and controlled by R. Osborne, which enriched him at the expense of customers who paid inflated prices for natural gas.  (*Id.* at ¶ 282.)  Thus, even though a parent corporation is generally not liable for the acts of its subsidiaries, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), as noted below, Plaintiffs' Complaint plainly sets forth facts demonstrating that Gas Natural and its subsidiaries, as a result of Defendant R. Osborne's domination and influence, were fundamentally indistinguishable.[13]

---

[13]    In their opposition to Defendants' Motion to Dismiss, Plaintiffs raise a corporate veil piercing argument.  (Plaintiffs' Opposition, Doc. No. 40 at 23-24.)  As Defendants note in their reply, however, Plaintiffs failed to raise a veil-piercing theory in their Complaint and therefore have waived any such argument.  (Defendants' Reply, Doc. No. 11 at n.17, citing *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 721 n. 7

Defendant Degenstein noted in an interview that the regulated part of Gas Natural "defines who we are."  (CAC, Doc. No. 36 at ¶ 51.)  Indeed, according to allegations in Plaintiffs' Complaint, the Ohio Utilities contributed approximately 90% of the revenue stream and 95% of net income to Gas Natural.  (*Id.* at ¶¶ 4, 51.) Therefore, Gas Natural, a holding company, distributes and sells natural gas through its regulated subsidiaries, and the revenue from those subsidiaries is the lifeblood of the Company.  Thus, even though Gas Natural's directors do not owe fiduciary duties to the Company's subsidiaries, it is by no means unreasonable to conclude that the Board had a duty to scrutinize the RFP process and, at the very least, be familiar with the internal operations at the Ohio Utilities.  For example, Plaintiffs allege that as soon as JDOG was used for gas purchasing, Northeast and Orwell began paying more for local production, "with rates skyrocketing to $0.85 per Mcf *more* than the average cost of interstate gas."  (*Id.* at ¶ 104) (emphasis in original).  According to Plaintiffs, Gas Natural did not question JDOG's rates, but merely verified the rates and quantities billed by JDOG, passing the "excessive costs" on to consumers.  (*Id.*)  Given that Gas Natural is a holding company for the Ohio Utilities*,* Defendants are hard-pressed to make a feasible argument that the Board did not owe a duty to Gas Natural's shareholders to thoroughly examine transactions that took place among Gas Natural, its subsidiaries, and JDOG.

Defendants argue that Plaintiffs have merely pointed to the Individual

---

(W.D. Ky. 2013)).  The Court has not relied on a piercing the corporate veil theory to find that Plaintiff has pled valid breach of fiduciary duty claims against the Outside Director Defendants.

34

Defendants' membership on the Board as evidence of alleged wrongdoing.  This argument is belied by the assertions in the Complaint, which clearly set forth detailed factual allegations suggesting liability.  Moreover, the Complaint alleges that the actions fo Gas Natural and its subsidiaries were intertwined and "fundamentally indistinguishable."  (*Id.* at ¶¶ 78, 122, 177-197.)  For example, Plaintiffs allege that Defendant Smith, Gas Natural's CFO and President of Orwell, Northeast, JDOG, Great Plains Natural Gas Company, and Lighting Pipeline Company, Inc., testified to PUCO that he thought he was President of Gas Natural, but he could not be certain, and that he also was not sure whether he had been President of JDOG.  (*Id.* at ¶ 182.)  Plaintiffs' Complaint states that "PUCO declared that defendant Smith's testimony was the 'most notable' example of 'severe organizational dysfunction within the Companies and between the regulated companies and their nonregulated affiliates.'" (*Id.*)  Plaintiffs allege that as a result of the "absolute failure of Gas Natural's fiduciaries to ensure appropriate functioning internal controls," PUCO staff recommended in the 2013 Order that "'the Commission order an investigation into the management practices of the Companies.  Staff urged the Commission to not only inquire into the Companies, *but to include their related and affiliated regulated companies, as well*.'"  (*Id.* at ¶ 190) (emphasis added.)  Thus, even though PUCO audited two of Gas Natural's subsidiaries, not the Company itself, Plaintiff has presented evidence showing that PUCO uncovered a severe lack of internal controls spanning several of R. Osborne-controlled entities, including, but not limited to, Gas Natural.

Furthermore, Plaintiffs' Complaint alleges facts showing that Defendant R. Osborne has appointed all but one member of Gas Natural's Board and that he has

"stacked the Company and its Board with those who are loyal to him" and "do not challenge [his] ultimate control over the Company."  (CAC, Doc. No. 36 at ¶ 1.) Assuming *arguendo* that the Outside Director Defendants had no *actual* knowledge of the alleged scheme to rig the RFP process, Plaintiffs have pled sufficient facts to show at least reckless disregard for the best interests of Gas Natural.  Plaintiffs have alleged particularized facts linking the defendant directors–at least four of whom have established were beholden to Defendant R. Osborne–to concerted board action. Defendant R. Osborne is or was the controlling shareholder of a number of entities that conducted business with Gas Natural.  (*Id.* at ¶ 87.)  Plaintiffs' Complaint details numerous instances of related-party transactions that the Board approved in favor of Defendant R. Osborne and his companies.  (*See id.* at ¶¶ 88-99.)  For instance, Plaintiffs have alleged that in December 2011, Gas Natural paid $600,000 to purchase 9.24 acres of land from Black Bear Realty, a company owned and controlled by R. Osborne.  (*Id.* at ¶ 90.)  As another example, Plaintiffs' Complaint alleges that Gas Natural made a $2.1 million investment in Kykuit Resources, of which R. Osborne at the time owned a 26.4% membership interest.  (*Id.* at ¶ 93.)  Furthermore, Plaintiffs have provided a statement from a confidential witness that "there was an arrangement with defendant R. Osborne's companies where, if his wells were producing gas, one of the Ohio LDCs–Brainard, Orwell, or Northeast–would buy all of it, regardless of their actual needs."  (*Id.* at ¶ 96.)  Plaintiffs' Complaint alleges that in total, Gas Natural paid over $31,712, 852 to Defendant R. Osborne through related entities from 2010 to 2013.  (*Id.* at ¶ 101.)

Finally, Plaintiffs have sufficiently demonstrated that four of the Outside Director

Defendants–Brooksby, Fedeli, Male, and Smail–as members of Gas Natural's Audit

Committee ("Audit Committee Defendants") during the relevant time were at least

reckless in failing to implement and maintain a system of internal controls and in

approving improper financial statements and certifications regarding the efficacy of the

Company's internal controls.  Plaintiffs' Complaint alleges that the aforementioned Audit

Committee Defendants–pursuant to the Committee's Charter–were required to ensure

that Company funds were not used for personal benefit; that business transactions

were properly authorized and completely and accurately recorded on the Company's

books and records; and that Gas Natural conducted its business in accordance with all

applicable laws, rules, and regulations.  (*Id.* at ¶ 259.)  A breach of fiduciary duty of

loyalty exists where the directors failed to implement "any reporting or information

system of controls," or, if they did implement such controls, "consciously failed to

monitor or oversee its operations."  *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66

A.3d 963, 981 (Del. Ch. 2013).  A finding of liability is conditioned on a plaintiff's

showing that the directors were aware that they were not fulfilling their fiduciary duties.

*Id.*

Here, the Audit Committee Defendants were required to oversee the "financial

reporting process" and Gas Natural's "systems of internal accounting and financial

controls."  (Exhibit 2 Gas Natural Inc. Audit Committee Charter, Doc. No. 40-2 at 1-2.)

Plaintiffs have alleged that the Audit Committee Defendants were at least reckless in

failing to perform their duties, as documented by PUCO's audits and investigations.

Plaintiffs' Complaint alleges that the internal controls at Gas Natural were so lacking

that PUCO declared in the 2013 Order–after it had previously issued warnings to the

Company in the 2011 Order–that "[i]t appears from the evidence that the Companies demonstrated an indifference to their fiduciary duties."  (CAC, Doc. No. 36 at ¶ 176.) PUCO reported that "the related entities had access to the books, records, and offices of the Companies," and that "the Companies blurred the lines of corporate separation by allowing affiliates and related entities access to the records of the regulated companies and by not ensuring that adequate security measures were in place."  (*Id.* at ¶ 177.)  According to Plaintiffs, PUCO repeatedly stressed that Gas Natural's internal controls were a complete afterthought, even for critical functions like SOX compliance. (*Id.* at ¶ 228.)  Plaintiffs allege, for example, that the Company's "assistant controller was unaware of who was responsible for compliance at Northeast, Orwell, or Gas Natural."  (*Id.* at ¶ 184.)

In his Reply, Defendant R. Osborne argues that "*[w]hile the 2013 PUCO Order may be a reasonable basis for alleging that Orwell and [Northeast]'s internal controls were deficient*, the Order does not support the conclusion that any [Gas Natural] director or officer knew of these deficiencies."  (R. Osborne's Reply, Doc. No. 62 at13) (emphasis added.)  As discussed previously, however, Plaintiffs' Complaint details  the interconnectedness of Gas Natural and the Ohio Utilities.  For example, Plaintiffs' Complaint alleges:

> One theme highlighted by the PUCO Staff was the pervasive nature of defendant R. Osborne's Related Entities.  Critically, the **"*Staff cited to evidence that related entities had access to the books, records, and offices of the Companies.*"** PUCO noted that ***"the Companies blurred the lines of corporate separation by allowing affiliates and related entities access to the records of the regulated companies and by not ensuring that adequate security measures were in place."***

38

\*\*\*

> The internal controls at Gas Natural were so lax that **"*the Companies exhibited a general indifference and unawareness of positional titles held by management within the Companies and the accompanying fiduciary duties and responsibilities."*** The evidence was so strong that PUCO stated there was *"a pattern of blurred lines of authority and responsibility and a general lack of accountability."* The Staff noted that "many of the witnesses *held multiple senior titles and positions within these affiliated and related companies***."** The Staff *"insisted that the lack of accountability and circular reporting poses fundamental problems and evidences a need for a full review by an auditor***."** PUCO explicitly agreed with the Staff's recommendation.

> Staff further acknowledged the damaging effects of defendant R. Osborne's *"authority and control over the Companies and their related entities,"* noting that *"his involvement is pervasive."*

(CAC, Doc. No. 26 at ¶¶ 177, 180-181) (emphasis in original).  Construing the Complaint in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have stated particularized facts which, if proven, show that the Audit Committee Defendants knowingly failed to implement and maintain a system of internal controls and approved improper financial statements and certifications regarding the efficacy of Gas Natural's internal controls.

Plaintiffs have alleged with particularity that the Outside Director Defendants "breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in a multi-year scheme to artificially inflate its natural gas prices, funnel money into affiliated companies, and ignore various terms associated with the 2010 audit, 2011 stipulation, and 2011 opinion and order."  (*Id.* at ¶

38.)  Plaintiffs have not, as Defendants suggest, merely asserted that the Outside Director Defendants are liable for fiduciary duty breaches as a result of their membership on Gas Natural's Board.   Rather, the detailed allegations in the Complaint find support in thousands of pages of documentary evidence submitted in connection with the PUCO proceedings; PUCO analyses, reports, and orders; U.S. Securities and Exchange Commission filings; and statements from confidential witnesses.  Under the plaintiff-friendly Rule 12(b)(6) standard, Plaintiffs have pled valid breach of fiduciary duty claims against the Outside Director Defendants.

### b.    Plaintiffs' Claims for Unjust Enrichment

Plaintiffs have alleged that the Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received by breaching fiduciary duties owed to Gas Natural.  (CAC, Doc. No. 36 at ¶ 294.)  Defendants argue that Plaintiffs' claims for unjust enrichment fail for lack of a causal relationship between the compensation and the alleged wrongdoings.

Under Ohio law, a claim for unjust enrichment requires the following: (i) a benefit conferred upon the defendant; (ii) knowledge by the defendant of the benefit; and (iii) retention of the benefit by defendant under circumstances where it would be inequitable for defendant to do so without compensation. *DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, 2:07-CV-1064, 2008 WL 755283 (S.D. Ohio Mar. 19, 2008).  In seeking dismissal of Plaintiffs' unjust enrichment claims, Defendants have cited case law that stands for the proposition that in order for the receipt of ordinary director compensation to amount to unjust enrichment, it must have a "causal relationship" with the "wrongful activities" alleged. (Motion to Dismiss, Doc. No 38 at 24.)  For example, in *In re Pfizer Inc. Shareholder*

40

*Derivative Litigation*, the court dismissed the plaintiffs' unjust enrichment claim, explaining:

> [T]he only enrichment alleged by plaintiffs consists of defendants' salaries, benefits, and unspecified bonuses. Plaintiffs have not pleaded that defendants' compensation during this period was of extraordinary magnitude, and have not cited any legal authority supporting the proposition that the mere retention of directors' and officers' ordinary compensation can sustain an unjust enrichment claim predicated on allegations that these defendants breached their fiduciary duties.

*In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2010).

Similarly, in *Marsteller v. ECS Federal, Inc.,* the court dismissed a counterclaim for unjust enrichment where the defendant "fail[ed] to allege any 'causal relationship' between [plaintiff's] allegedly wrongful activities with regards to proprietary and confidential information and her 'ordinary compensation.'" *Marsteller v. ECS Fed., Inc.*, 1:13CV593 JCC/JFA, 2013 WL 4781786, *10 (E.D. Va. Sept. 5, 2013).  The court acknowledged that gains derived from a breach of fiduciary duty might give rise to an unjust enrichment claim in some circumstances, but under the particular facts of the case, the plaintiff's allegedly wrongful acts did not lead to her compensation. *Id.*  Furthermore, in *In re Capital One Derivative Shareholder Litigation,* the court dismissed an unjust enrichment claim where the plaintiffs failed to plead facts indicating a causal relationship between compensation and alleged company losses. *In re Capital One Derivative S'holder Litig.*, 952 F. Supp. 2d 770, 783 (E.D. Va. 2013).

In opposing Defendants' Motion to Dismiss, Plaintiffs do not attempt to dispute the authorities holding that a claim of director compensation as unjust enrichment must have a causal relationship with the wrongful activities alleged, nor do Plaintiffs cite any authority

41

supporting the notion that an unjust enrichment claim may be maintained based on the payment of the Individual Defendants' ordinary compensation.  Instead, Plaintiffs maintain that to state a claim for unjust enrichment, they need only plead that a defendant secured a benefit and that it would be unconscionable to allow them to retain that benefit.  (Plaintiffs' Opposition, Doc. No. 40 at 25.)  Plaintiffs' bare assertion that they have stated a valid claim for unjust enrichment because it "would be unconscionable to allow [the Individual Defendants] to retain the compensation they received while knowingly breaching their fiduciary duties to Gas Natural and causing the Company to incur severe damages" falls short of stating a cognizable claim of unjust enrichment.  Accordingly, Plaintiffs' claims against the Individual Defendants for unjust enrichment (Count IV) should be dismissed.

### c.    Plaintiffs' Claims Against Defendants Sprague, Abrams, and Smail

Defendants argue that Plaintiffs' claims against Defendants Sprague, Abrams, and Smail must be dismissed because they relate solely to events occurring after these Defendants' service on the Board.  The tenures of Defendants Sprague, Abrams, and Smail concluded in March 2010, June 2010, and July 2010, respectively.  (CAC, Doc. No. 36 at ¶¶ 29-33.)  According to Defendants, the only alleged conduct that could conceivably be attributable to Defendants Sprague, Abrams, and Smail are the irregularities uncovered by PUCO in connection with the 2010 Audit, which examined the rates charged from March 1, 2008, through February 28, 2010, for Northeast, and July 1, 2008, through July 30, 2010, for Orwell.  (CAC, Doc. No. 36 at ¶ 107.)  Defendants note that Gas Natural did not acquire the Ohio Utilities until January 5, 2010, only a few months before Sprague, Abrams, and Smail left the Board.  (CAC, Doc. No. 36 at ¶ 10.)

42

Plaintiffs' claims do not, as Defendants argue, relate solely to events occurring after Sprague, Abrams, and Smail left the Board.  While none of these Defendants remained on the Board by the time PUCO issued its 2011 Order, they were all Board members during at least some of the time period covered by PUCO's 2010 Audit and when Gas Natural acquired Northeast, Orwell, and Brainard in January 2010.  Accordingly, Plaintiffs have established a basis for their claims against Defendants Sprague, Abrams, and Smail.

### 4.    Whether Plaintiffs' Claims Against the Officer Defendants Based on Alleged Insider Trading State Cognizable Claims Under Ohio Law

Defendants argue that Plaintiffs' breach of fiduciary duty claims against Defendants R. Osborne, Smith, and Degenstein (the "Insider Selling Defendants") based on allegations of insider trading must be dismissed.   In support of their argument for dismissal, Defendants cite a case from this District wherein the Court dismissed the plaintiffs' claim alleging that one defendant breached his fiduciary duties through alleged insider trading. *In re Goodyear Tire & Rubber Co. Derivative Litig.*, 503CV2180, 2007 WL 43557 (N.D. Ohio Jan. 5, 2007) (Adams, J.).   That case held that "Ohio law does not recognize a derivative claim for insider trading." *Id.* at *8.   In *Goodyear*, however, the Court did not cite any legal support for its conclusion that a derivative claim for insider trading does not exist in Ohio.   Furthermore, Defendants have not presented any additional Ohio cases or statutes addressing this issue, nor have Plaintiffs pointed the Court to any Ohio law suggesting that a fiduciary duty claim may rely on allegations on insider trading.

In the absence of clear Ohio law addressing the issue, this Court turns to Delaware law, which plainly recognizes a breach of fiduciary duty claim premised on insider trading. *See Brophy v. Cities Serv. Co.,* 70 A.2d 5 (Del. Ch. 1949).   A *Brophy* claim is an action for

43

breach of fiduciary duty premised on a fiduciary's insider trading.  For a *Brophy* claim to survive a motion to dismiss, the complaint must plead particularized facts sufficient to support a reasonable inference that: (1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.  *Khan v. Kolberg Kravis Roberts & Co., L.P.,* 23 A.3d 831, 837 (Del. 2011).

Here, Plaintiffs have alleged that Defendants R. Osborne, Smith, and Degenstein have breached fiduciary duties owed to Gas Natural through, *inter alia*, selling their personal holdings while the Company's stock was artificially inflated.  (CAC, Doc. No. 36 at ¶ 227.)  According to Plaintiffs, throughout 2010 to 2013, while PUCO was investigating two of Gas Natural's subsidiaries, the Insider Selling Defendants began liquidating their stock.  (*Id.*)  Plaintiffs maintain that as officers and directors of Gas Natural, the Insider Selling Defendants were privy to material, non-public information about Gas Natural's "true business health," including that:

> (i) the Individual Defendants had failed to implement effective internal controls at the Company or an effective SOX compliance program; (ii) the Individual Defendants had rigged the RFP process and violated the 2011 Stipulation; (iii) the Individual Defendants had allowed a lack of separation between Related Entities controlled by defendant R. Osborne, and a lack of regard for corporate entities.

(*Id.* at ¶ 228.)  Plaintiffs further allege that:

> The wrongdoing that PUCO uncovered, detailed above, was known to the Insider Selling Defendants because of their duties, and their involvement with PUCO's investigation.  Rather than sharing this information, or the news that the investigation was sure to uncover damaging information about the Company that

> would be made public as part of PUCO's audit process, the
> Insider Selling Defendants sold their shares of Gas Natural.
> The revelations eventually revealed in PUCO's 2013 Order
> were later digested by analysts and disseminated to the public,
> exposing the truth.

(*Id.*)  Plaintiffs' Complaint details each allegedly improper stock sale by each defendant, followed by an explanation of why the sales were suspicious.  (See *id.* at ¶¶ 229-232.)

Defendants maintain that Plaintiffs' claims alleging breach of fiduciary duty against the Insider Selling Defendants based on alleged insider trades must be dismissed, because Plaintiffs have not asserted any damage to Gas Natural resulting from the stock sales.  As Defendants note, Ohio law "requires proof of damages to the corporation as a prerequisite to any *shareholder's derivative suit*."  *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 671 (S.D. Ohio 2003) (emphasis added).   Defendants incorrectly interpret this requirement to mean that Plaintiffs had to allege damage to the Company *resulting from improper stock sales.*  Plaintiffs have alleged that Gas Natural sustained damages as a result of breaches of fiduciary duty by the Individual Defendants.  (*See* CAC, Doc. No. 26 at ¶¶ 234-236.)  Plaintiffs were not, as Defendants suggest, required to show that those alleged damages were a result of insider trading, as Plaintiffs have not plead a cause of action for insider trading, but rather assert allegations of insider trading as one way of proving Count II of their Complaint.  Indeed, the Supreme Court of Delaware has clearly addressed this issue, holding that actual harm to a corporation is not required in order for stockholders to assert derivative *Brophy* claims for insider trading by fiduciaries.  *See Khan,* 23 A.2d at 837.

Defendants also argue that Plaintiffs' claims as to Defendant Degenstein "are particularly defective" because "the CAC lacks any allegations whatsoever detailing what

45

material nonpublic information Mr. Degenstein is alleged to have known." (Motion to Dismiss, Doc. No. 38 at 27.)  According to Defendants, the fact that Plaintiffs have not alleged that Defendant Degenstein had any role at any of the Ohio Utilities or other Gas Natural subsidiary entities that were at the center of the PUCO audits is fatal to Plaintiffs' insider trading allegations.  This argument is not well taken.  Plaintiffs allege that Defendant Degenstein, as Gas Natural's former President and COO, was aware of specific material nonpublic information and traded on that basis.  (CAC, Doc. No. 36 at ¶¶ 227-228.) Plaintiffs assert:

> While in possession of this knowledge, defendant Degenstein sold 20,000 shares of his personally held Gas Natural stock for proceeds of over $194,000 during the Sales Period.  Defendant Degenstein's sales were timed to maximize profit from Gas Natural's then artificially inflated stock price.  Defendant Degenstein's sales are suspicious given that his stock sales represented almost 95% of his holdings . . . and that they occurred during the time PUCO was investigating Gas Natural, and just a month before the 2013 Report was issued.

(*Id.* at ¶ 231.)  Thus, Plaintiffs have alleged that Defendant Degenstein was in a position to know of material nonpublic information related to the PUCO audits by virtue of the fact that he served as Gas Natural's President and COO from June 2008 to November 2013. A reasonable inference from Plaintiffs' allegations is that Defendant Degenstein, as an officer of Gas Natural during the relevant time period at issue here, was privy to insider information regarding the Company's dealings with its subsidiaries which were not revealed by the 2011 PUCO Order, and that he sold 95% of his holdings on the basis of that information.   Plaintiffs' Complaint provides sufficiently detailed factual allegations to support their claim that Defendant Degenstein began liquidating his stock while PUCO was investigating the Company and before the revelations in PUCO's 2013 Order were digested

46

by analysts and disseminated to the public.  (See *id.* at ¶¶ 227-228.)  For the foregoing reasons, Plaintiffs' breach of fiduciary duty claims against the Insider Selling Defendants should not be dismissed.

>    **5.**     **Whether Plaintiffs' Remaining Claims against Defendant Degenstein are not "Plausible" and Should be Dismissed.**

Defendants argue that because Plaintiffs fail to state common law claims based on insider trading against Defendant Degenstein, he must be dismissed from this action altogether.  According to Defendants, Plaintiffs have failed to allege facts explaining how Defendant Degenstein breached his fiduciary duties or caused any corporate waste based on alleged overpayments by the Ohio Utilities or other Gas Natural subsidiaries to other entities controlled by Defendant R. Osborne.  Defendants' arguments lack merit.

First, as discussed above, Plaintiffs' breach of fiduciary duty claim against Defendant Degenstein may be based on allegations of insider trading alone. Furthermore, the Complaint includes additional allegations beyond those relating to Degenstein's stock sales:

> Defendant Degenstein knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge the public for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) engage in various self-dealing transactions designed to benefit defendant R. Osborne at the cost of Gas Natural and its subsidiaries; (iii) refuse to follow PUCO's directives to correct known problems; (iv) rig the RFP to ensure its affiliates would win the contracts; and (v) operate in an environment utterly devoid of adequate internal controls.

(CAC, Doc. No. 36 at ¶ 27.)

Plaintiffs have alleged that Defendant Degenstein, as President and COO of Gas

47

Natural, breached his duty of good faith "by creating a culture of lawlessness within Gas Natural, and/or consciously failing to prevent the Company from engaging in the unlawful acts" alleged in the Complaint.  (*Id.* at ¶ 280.)  Plaintiffs note in their Complaint that in an interview for *The Wall Street Transcript* in September 2011, Defendant Degenstein explained the structure of Gas Natural, noting that the regulated part of the Company–the Ohio Utilities–"defines who we are as it contributes approximately 90% of the revenue stream and 95% of net income to the organization."  (*Id.* at ¶ 51.)  Thus, Plaintiffs have alleged that, like the director defendants, Defendant Degenstein, as an officer of Gas Natural, was privy to the operations at the Ohio Utilities, was aware of Defendant R. Osborne's scheme to exploit Gas Natural for his personal benefit, and did nothing to prevent or remedy R. Osborne's misconduct.  As Plaintiffs note in their Opposition, "[e]ach of the Individual Defendants, including defendant Degenstein, is alleged to have participated in defendant R. Osborne's exploitation of Gas Natural." (Plaintiffs' Opposition, Doc. No. 40 at 27 n.16, citing CAC, Doc. No. 36 at ¶¶ 8-10, 13-14, 27.)  Reading the Complaint in a light most favorable to Plaintiffs, Plaintiffs have stated a valid breach of fiduciary duty claim against Defendant Degenstein.

> **6.    Whether the Court Should Stay this Proceeding to Permit the Gas Natural Board to Investigate the Substantially Similar Allegations Presented in a Demand Letter.**

Finally, Defendants request, if this Court denies the motion to dismiss, that this Court grant a stay of proceedings in this matter.  Defendants state that, in March 2014, after the commencement of the individual shareholder derivative suits at issue in this case, another shareholder – who is not a plaintiff in this matter – sent Gas Natural's Board a letter (the "March 2014 Letter") demanding that the Board take legal action to

48

remedy various breaches of fiduciary duty by the directors and various members of the Board. (Motion to Dismiss, Doc. No. 38 at 8, Ex. E.)  Thereafter, the Board formed a "special committee" with the purpose of investigating the allegations in the March 2014 letter (the "Special Committee"):

> On March 26, 2014, the board of directors formed a special committee comprised of three independent directors to investigate the allegations contained in a letter received from one of our shareholders.  The letter demands that the board take legal action to remedy alleged breaches of fiduciary duties by the board and certain of our executive officers in connection with the Order and Opinion issued by the PUCO on November 13, 2013.  The special committee has the power to retain any advisors, including legal counsel and accounting, financial and regulatory advisors, that the committee determines to be appropriate to carry out its responsibilities in connection with its investigation. The special committee will investigate, evaluate and determine the position Gas Natural will take with respect to the letter.

(Form 10-K, Doc. No. 38-6.)  Defendants contend that a stay is appropriate to allow the Company to determine its response to the March 2014 Letter.

Plaintiffs oppose the request for a stay, arguing principally that the members of the Special Committee – which consists of three members, two of whom are Individual Defendants Argo and Brooksby – are neither independent nor disinterested.  Plaintiffs argue that, because Defendants Argo and Brooksby face "substantial likelihood of liability for breaching" their fiduciary duties to Gas Natural, they "cannot impartially consider the allegations" in the Complaint or the March 2014 Letter.  (Plaintiffs' Opposition, Doc. No. 40 at 34-35.)

It is well established that "a corporation may appoint a special litigation committee to investigate claims presented in a derivative action."  *Booth Family Trust v.*

49

*Jeffries*, 640 F.3d 134, 138 (6th Cir. 2011) (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981)).  The formation of such a committee is consistent with "fairly uniform" law  "sanctioning the general power of a special litigation committee to terminate a stockholder suit."  *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 375 (6th Cir. 1984).  Under the procedure established in *Zapata*, where a special litigation committee determines, after its investigation, that a derivative suit should be dismissed, the committee files a motion to dismiss pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.  *Booth Family Trust*, 640 F.3d at 138.  The stockholders who initiated the suit may oppose the motion.  *Id*.  Generally, it is not until this point – when a committee seeks to dismiss a derivative action and the stockholders oppose that dismissal – that the trial court considers "questions of committee independence."  *In re InfoUSA, Inc. S'holders Litig.*, No. 1956-CC, 2008 WL 762482, * 2 (Del. Ch. Mar. 17, 2008) ("[J]udicial economy is served by permitting the [independence] issue to be addressed after the committee has issued its report . . . ") (internal quotation marks omitted).  In the interim, courts generally "routinely grant[] reasonable stays to allow [special litigation committees] to complete their investigations."  *Id*. at * 1.

Given this, Defendants contend that Plaintiffs' arguments regarding the independence and disinterestedness of the Special Committee are premature.  Under the circumstances of the decisions on which the parties rely, Defendants would likely be correct.  In those cases, however, the boards of the various companies formed the special litigation committees in response to the shareholder derivative suits at issue.  In this case, the Board of Gas Natural formed the Special Committee to investigate the allegations of the March 2014 Letter, which was sent by an individual who is not a

plaintiff in this case.  Although the allegations in the March 2014 Letter are similar to the allegations in the Complaint, the description of the Special Committee's authority does not include any reference to this case.  Nor does the description otherwise authorize the Special Committee to take any action with respect to this case.  In sum, there is no evidence that the Board has vested the Special Committee with the authority to determine whether *this action* should be dismissed.  *See In re Keithley Instruments, Inc. Derivative Litig.*, 599 F. Supp. 2d 875, 891 (N.D. Ohio 2008) ("As Defendants point out, Plaintiffs' argument ignores the critical distinction between a special litigation committee and an investigatory committee.  The distinction lies in the authority vested in the committee by the Board.").  Given this, considerations of judicial economy actually weigh in favor of denying the stay, as it is not at all clear that, after completing its investigation, the Special Committee has any authority to seek dismissal of this consolidated action.  By granting the stay, this Court risks allowing an unspecified amount of time to pass – during which no progress will be made in this litigation – only to find, at the end of the stay, that the Special Committee's investigation has no bearing on the disposition of this case.  Accordingly, it is recommended that this Court deny Defendants' request for a stay in this matter.

### III.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the following:

1.      Plaintiffs' claims against the Individual Defendants for unjust enrichment (Count IV) should be dismissed;

2.      Plaintiffs' remaining causes of action should not be dismissed;

3.      Defendants' request for a stay of the proceedings should be denied.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 24, 2014

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of this notice.  **28 U.S.C. § 636(b)(1).** Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See **United States v. Walters*, 638 F.2d 947 (6th Cir. 1981)**; **Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

52